You may proceed. Good morning, Your Honors. Patti Lewis appearing on behalf of Xavier Green, appellant in this case. And I first would have to inquire if there's any specific areas this Court would ask me to address. Well, I'm curious about the UNRRA Act. Yes, Your Honor. The UNRRA Act is a sister act, if you will, to the Americans with Disabilities Act. And it provides that a person with disabilities is entitled to equal accommodations, facilities, services. Xavier here was afflicted with Erb's palsy, which is a condition leaving his left arm without any use. He cannot use the musculature of the arm. And the UNRRA Act in its does not require deliberate indifference to be shown. That's exactly what I'm after. The UNRRA Act seems to require a plaintiff show a violation of the ADA or intentional discrimination. And it seems that a school district's failure adequately to respond to complaints of peer harassment may satisfy the UNRRA Act. Is that the way you see it? Yes, Your Honor. And the trial court seemed to, or the district court seemed to think that was the case, too. The district court stated when it dismissed it that Xavier had not shown deliberate indifference on summary judgment. And as I read it in my interpretation, the UNRRA Act. Well, ER 150, the district court noted that your client's failure to show deliberate indifference to support his ADA claim. You might survive. That claim might survive nonetheless if he could show that peer harassment was on account of race and school officials failed to adequately address this complaint. So the district court seemed to recognize that and thought there was a material fact as to whether the harassment was based on race. But then just determined, as you might at the end of a trial, that the school had adequately addressed Greene's complaint. It seems that's the kind of thing that ought to survive summary judgment and go to a trial. Yes, Your Honor. And that's why we're here today. We were not allowed to present that to the court, of course, in trial. Why don't you explain that to me? This is not nearly as clear to me as it is to Judge Todd, so why don't you try to persuade me? Why doesn't the district court look and say, look, I'm going to look at the facts in the light most favorable to the plaintiff. Okay. And what the complainant complained of here was there was some name-calling going on. There was no threats of violence. He was never hit, and he reported those, and they dealt with the name-calling. He, you know, there was never any suggestion of violence. And then there's a fight. And why can't the district court in summary judgment look at that and say that is a reasonable response as a matter of law and the story? Because. It's certainly not deliberate indifference. Your Honor, I must admit that in behind this claim, there is the Congress's enactment of the Safe Schools Act. Which requires and mandates that schools provide intervention for making schools a safe place for our students. It doesn't change the question. The question is, look, we are told somebody is being called names. Now, kids get called names in school, schools all over the country, every day of the week. Sometimes if you count all the name-calling that goes on in schools, there's probably hundreds of such events every day in every school. Now, you can't say that every one of those events then becomes, you know, if at some later point a fight or violence erupts, the school can be held to go to trial as to whether it should have predicted that this one incident out of a hundred or a thousand or ten thousand. The name-calling would mature into a physical violence. There's nothing in this record that suggests that this was more any different from ordinary name-calling of the kind that kids cruelly engage in. I mean, it's not a nice thing, for sure. I do take exception to this, Your Honor, in the sense that these names are the principal, okay? You're the principal, okay? And so Xavier comes to you, or, you know, he goes to the nurses, and this is reported to you, and says, you know, there are these kids and they're calling these names. Okay, what do you do now? What is the thing that you expect the school to do in those circumstances? Well, in finding the principal, Xavier came to me on numerous occasions that he did come to the counselor and the nurses. Numerous is sort of an, you know, there were three or four occasions? More than that, Your Honor, between November until just two days before the event, the attack in March, he had been at least a half a dozen times to the nurse complaining that these children were frightening him to the point that he wanted to commit suicide. Now, that is to him, and that's what he felt like. They were calling him names which I don't know that I need to repeat here, but they were not nice names. They were names that I would not expect to be name-calling. They were names that inferred. These are names that relate to something under the ADA, which is particularly protected, aren't they? Yes, Your Honor, and also. Not just the common kinds of things that kids toss around? Exactly, and the direct response, the direct attack upon his disability by calling him a faggot, forgive me, but because he couldn't hold his arm in a certain way. What? A faggot. He was called a bitch, he was called a faggot, and he was called other names which. I'm sorry, what does that have to do with his disability? His disability in that he couldn't hold his arm in any manner other than in a loose way. A faggot, I gather, is a, in this context, referred to as a homosexual, yes? Yes, Your Honor. Okay, I want to talk about something else, some other meaning that I don't know. I just want to make sure, slang is difficult, so he's being called a homosexual. What does having a stiff arm have to do with being a homosexual? It's the way he walked and the way he carried it. It appeared to other students, to these students who were harassing him, that he was homosexual, that he was carrying this arm, this disabled arm that he couldn't carry. Okay. That was the way he took it. Okay, so let's say that's the case, although I find it quite strange, but okay. So what is the school to do at that point? Because the school is mandated by the Federal and State Safe Schools Act. I don't want you to tell me why. I want you to tell me what. They... Just tell me, you're the principal, complaints have come, they call him a faggot, they call him what, a white boy, they call him... Bitch and whore. Bitch, whore, faggot, and white boy. He's a black boy. Bitch, whore, faggot, and white boy. So you found out that these boys repeatedly call him those names. They're very terrible names, and I agree, and no student should have to endure them. We also know that they're used in school campuses all the time, and worse. So what do you do as a principal? What is a reasonable thing for you to do in those circumstances? We have discussions, we have training, we bring the boys in into a conflict resolution situation. We talk to them and explain what we can do to talk to each other in a more respectful way. We work with them, instead of just saying, as the nurse told Xavier, lay down and it'll be okay. Don't worry about it. They do quite a bit more than that. They call the parents of the children. I mean, the kids got into trouble for it, so it was not that they ignored their... The telephone call by the counselor, Winston, was made one time to the parents. She was only able to get a hold of two of the parents. That was all she did. Then she left it go. She didn't follow up, she didn't talk to the boys. Do we know the frequency of the events occurring post-contact with parents? We do not, Your Honor. The frequency of the harassment, in this case, once they called the parents? I do not. Does the record tell us? I do not, Your Honor. The record doesn't tell us that? No, it does not, Your Honor. Well, isn't that critical to this case, that having taken steps, that we show that the steps were inadequate to address the problem? And if we don't have evidence that these things occurred after the school undertook some remedial effort, however trivial, that it continued? I agree with the Court, and I will add to the Court's commentary that there were, when the nurse addressed the issue with Xavier's mother, when the nurse referred Xavier to the other counselor, there were two counselors. After that, the harassment continued, and it built and built and built. The other counselor, Mr. Thibodeau, did nothing. He doesn't even recall seeing Xavier. Well, but the school itself took steps later on, at some point later on, didn't they? I can't. Is the issue here the timeliness of it? Yes, Your Honor. As opposed to whether they took steps at all, that they should have intervened earlier? Is that really what you're arguing to? The issue is that they, whether or not they took any steps, it continued because it did culminate on March the 3rd or the 3rd. 7th. 7th, excuse me. And that, when that culminated on campus, at lunch, in front of all of his peers, he was attacked viciously. Okay, so the answer to my question is, it did continue after the parents were called. It did. It did continue. And the record shows it by virtue of the encounter that resulted in the expulsion. Yes, Your Honor. Why is this all this academic anyway, because it's barred by the 11th Amendment? I'm sorry? Why is the relief barred by the 11th Amendment? Therein lies the crux. I believe that this Court's, the Ninth Circuit decision in Ballenger was in error in that it did not have the California statutes before it to properly analyze the relationship between the State and the State. The short answer is, we need to go and bank to overrule Ballenger for you to have any hope of relief. Is that the bottom line of your argument? Yes, Your Honor. Okay. That's a perfectly good answer, but that's the answer, right? Yes. Why don't we hear from the other side? We'll give you a minute as we go about it. So tell me. Good morning, Your Honors. My name is John Morris, appearing on behalf of Defendant Morris. Do you think we should go and bank to overrule that case? Well, the short answer is no and of course not. Okay. I thought you might say that. The short answer is no and the long answer is of course not. Yeah, right. Ballenger. I can offer just a little bit more if the Court cared to. And if you're in the Tenth Circuit and even suggest I'll vote, you get a sigh that would blow you out of the Court room. I'll be happy to stand on no if the Court is satisfied with that. You know, I actually would like to hear a little bit more. And we took up much of counsel's time on this underlying issue, so we'll give her a little more time to reply to this. But tell us why, you know, we did read the briefs and counsel does argue that Ballenger got it wrong or that things have changed since Ballenger in a way that makes school districts no longer a state instrumentality. You know what those arguments are, so why don't you go ahead and address them. I will. Thank you. I don't think Ballenger got this issue wrong. Ballenger, not Ballenger. Okay. Yeah, I don't think Ballenger got the issue wrong. And I think that if the Court reexamines Ballenger, it will see that it relied on five, what I've called the Mitchell factors from this Court's decision in the Mitchell case. The five Mitchell factors include, most importantly, the question of whether or not a judgment against the school district would be satisfied from state funds. And the simple answer to that question, and that, of course, is the predominant issue set forth in the Ballenger case, is yes. Even though the state does not pay directly the funds that would be against it in an action like this, there's no question, and the situation has not changed since Ballenger, that fundamentally California's state school system depends on state funding. So whether directly or indirectly, there's no question but that any judgment against the school district in this case would be satisfied from state funds. That's regarded as the primary Ballenger factor. And there's nothing about the landscape of the California school system or California school funding which has changed that or that requires reanalysis by this Court. Help me out here. I'm not sure to what extent any of this is in the record or any of this is judicially noticeable. And so we're just going to have to do the best we can. Just give me your understanding of how school districts, school districts is your client, right? Yes, sir. So maybe you know a little bit about this. How are school districts funded in California? I've lived in California for years, I have no idea. In truth, Your Honor, my understanding of it comes primarily from this Court's extensive discussion of that subject in the Ballenger case. The Ballenger case includes a detailed recitation of how California state school funding is accomplished all by way of legislation passed. I don't even have the date in my mind, but there is a legislation. So basically the description on Ballenger is, so far as you know, still the accurate description. Nothing has changed materially. And certainly there's nothing in the record to suggest otherwise. So the answer to your question, Your Honor, is yes. There's nothing significant that's changed since then. There's nothing in the record and nothing that you know of which we can take judicial notice. That's correct. And the bottom line, though, is that fundamentally schools are all funded by the state on a per-person basis. After Serrano v. Priest? Yeah, exactly. Exactly. And after Prop 13, I think it was. But that's the fundamental factor, and there's nothing about that in the legal landscape that I think would encourage this Court to revisit it. But if the Court did revisit it, it would see that the four other factors set forth in Mitchell, adopted in Ballenger, and carefully recited by the district court in this case all cut in favor and support the Ballenger decision. That is to say, there's no question but that the schools perform a central government function in California. And while it's true, the third ba... That's true of schools all over the country. Well, it is. It is. It cuts as much against you as for you. Well, it depends on what we do with the voucher system, I suppose. I'm not familiar with the voucher. That's right. And if the system changes, then it might well be different. It might. And I gather other states are quite different. I don't know about other states, Your Honor. But again, returning to the five Ballenger factors, all of them, I think, cut in favor of finding Eleventh Amendment immunity, including whether or not the school districts have the power to take property in their own name. They do technically, but the law is clear that the property is actually owned by the state. There's no question but that California school systems have the corporate status of a state entity. My point is that, by all means, reexamine Ballenger as the court likes, but the five factors upon which Ballenger relies remain unchanged. Of course, we can't, as a three-judge panel, reexamine an opinion. We'd have to... There'd have to be an in-bank proceeding. So let's get on to the next step of inquiry, whether it's worth a candle to even reconsider Ballenger. Your position is that they have no substantive claim, right? You want to address the substance of the Unruh Act claim? Sure. But before I do, let me just close with the idea that unless the Court is willing to review Ballenger, I think the bottom falls out of the entire case. With respect to the Unruh Act, Your Honor, there's no question but that the Unruh Act prohibits only intentional discrimination based on either race or disability considerations. Let me read Judge Gonzalez's statement of the law in our June 22nd order. However, a school district's inadequate response to a student's complaints of peer harassment satisfies the intentional discrimination requirement and constitutes a denial of advantages, facilities, privileges, or services. And I'm citing two cases. You've read this a million times. Accordingly, in order to establish a claim under the Unruh Act, plaintiff need only establish that he experienced peer harassment based on his disability or race, and she admits there's a genuine issue of material fact on that, so that survives summary judgment. And, and here's the problem, the defendants, and here's the key language, failed to take reasonable steps to respond to his complaints about such harassment. Then in the next paragraph, the problem is that the judge says, well, and the case fails, because plaintiff has failed to establish that defendants acted with deliberate indifference or otherwise failed to take prompt action to address the harassment. I see a difference between failure to take prompt action and the law that says failed to take reasonable steps. Prompt is different from reasonable. So I see a disconnect there, and why isn't there a genuine issue of material fact on whether these steps were reasonable? Not, this may be a regular school like everybody else, but he's an IEP disabled kid with serious problems, so it seems that elevates the question of what's reasonable. And the proof of the pudding is in the eating here. The steps weren't reasonable because they beat the hell out of this kid. Well, I don't think the proof, I don't think that is the proof, Your Honor. That's the problem I have with Judge Gonzalez's statement. She says failure to take reasonable steps gets you there, but here there was just not prompt action. She didn't say that as a matter of law the steps were reasonable, just that they weren't prompt. Oh, I think that's implicit in her ultimate ruling, Your Honor. And while the Court seems to be. It's not explicit. Well, okay. But I submit that it is sufficiently implicit, and otherwise the Court wouldn't have ruled as it did. It acknowledges. We review that de novo, though. Why, as a matter of law, were the steps taken reasonable, such as to defeat summary judgment? Well, we can go through an exact chronology. Thank you. But first, let me make a prefatory point that as part of the plaintiff's proof, it's incumbent on them to show discrimination based on disability. And while all the names that the plaintiff was called by the students who attacked him may, indeed, support an inference of disability-based discrimination by the attackers, there's no such suggestion or implication that can be attached to the school district by that. That is to say, in order to prevail on her case, on its case, the plaintiff has to establish discrimination by the school district based on disability. And there's no evidence whatsoever to support that conclusion, notwithstanding the evidence of disability discrimination. Then she's wrong. The plaintiff need only establish the experience of peer harassment based on disability of race, and failed to take reasonable steps to respond to his complaints. I'm sorry, I'm getting lost in where the court is. Where does it say that the defendants themselves have to have failed to respond based on race or disability? The way I read the law is, if he's experiencing this stuff in the school, and the school doesn't do anything about it, even if the school has no racial animus or disability animus whatsoever, their failure to take reasonable steps to respond may be an UNRAC violation. Well, I think the court was acknowledging that as a theoretical starting point for its analysis. At the end of the day... Why don't you tell me why, as a matter of law, the steps were reasonable, such as the defeat summary judgment? Because the evidence was clear as to what the responses of the school district were. Which was what? Well, which was... Go through it for me. Okay. Pretend you're arguing the summary judgment motion. Thank you. Okay. The first thing that happened when the student came to the school nurse, is the school nurse called the parents of the child and asked whether it would be appropriate to make a reference of the child to a school counselor. A permission was obtained, and the student was, in fact, referred to a school counselor. The student advised the counselor of the harassment he was suffering at the hands of these boys, and the school counselor personally telephoned every one of the families of the boys charged, spoke with every one of the boys, and told them to cut it out. Now, in response to your Honor's question earlier, I don't believe that there's any indication in the record as to the exact chronology, and so I can't speak to it, the exact chronology as to when those phone calls were made on behalf of the boy in relation to the critical, I think it was March 7th. But what we do know is that there was evidence in the record, or in the material presented at the summary judgment stage, that it continued sufficiently that it erupted in the event for which he is now disciplined for his response. Well, I think the only thing we know for sure, Your Honor, is that there was the one ultimate event that occurred after those phone calls. I don't think the record discloses that there was anything else intervening. Well, but there's a reasonable inference, at least for purposes of summary judgment, because we have to draw both the evidence and the inferences that may be drawn there from in favor of the non-moving party, and as a result, I don't know why it isn't a reasonable inference that this thing continued to build up if, in fact, they told him that they had called the parents and talked to the boys and told them to knock it off. I just don't see the inference. The evidence is not that this boy went out looking for a chance to retaliate. The evidence was he was responding to the continuation of this harassment. Isn't that the evidence that was before the trial court? I'm sorry. I'm not gathering the Court's question exactly. I don't want to respond inaccurately. Can I ask you to put the question again? Well, the question is, isn't there sufficient evidence that you can go to trial on the basis of your response under the law, at least as the Ninth Circuit has set it out, that their response was not adequate under those circumstances? Well, if the Court is going to draw the line there, then I submit that there will never be a case that will be appropriate for summary judgment in the context of a case like this. Well, in order to answer Judge McKay's question, we have to focus in on what the duty is of the school district. If it's a negligence standard, then maybe it's a debatable point. If it's something different, then obviously more will be required. So I don't mean to keep you from answering the question. I want to hear the answer to the question, but you should probably do so by reference to the legal standard. Okay. And thank you for that prompt, Your Honor. But indeed, the legal standard is deliberate indifference. The standard is not negligence. And while there may arguably be some possible inferential negligence connection that can be drawn, Your Honor, I simply don't think. You have said something different earlier in your argument. It's okay. I think I heard you say that what you need is more than deliberate indifference. What you need is a failure to intervene, which is itself on the school district's part motivated by an intent to discriminate. I see those as two separate components, Your Honor. One, there has to be deliberate indifference, and it has to be deliberate indifference with reference to a disability discrimination. By the school district, what case says that? I just think that's implicit in the language of the act. It's to say that both the harassers and the school district have to share the same kind of impermissible animus. I've read the case law. I don't understand there to be any legal point of reference with reference to the harassers. That is to say, the law as written, I think, simply applies on its face to the person or the entity in this case, the school district, being charged. Being charged with the violation. I mean, to say that the harassers were motivated by discrimination. Well, one thing is clear to me. The steps taken didn't work. Right? True. Okay. So isn't it a fair inference that they weren't reasonable? Didn't work. No. He went in four or five times to the nurse. No. Told the nurse he was contemplating suicide. She called the mother. Referred him to a counselor. The counselor doesn't even know, doesn't even remember the whole thing. Well, but the other... Winston didn't do anything. Just don't worry about it. It'll go away. But the other counselor, Your Honor, there's very clear evidence that the other counselor called every one of the parents. The school nurse. Well, okay, but it was a representative of the school. The counselors did not. Neither Thibodeau nor Wilson. Okay, neither, however, is there any evidence that the student made further complaints after those phone calls were made? The district court specifically noted, and I can't recite the chronology to Your Honor, aside from to reflect upon the... Prior to March 7th... Apparently the record does not reflect anything about intervening harassment. Is that your understanding of the record? Yes, sir. That is my understanding. So the only thing that could support the Plains case is the possible inference that it continued in a crescendo resulting in... Drawn backward from what ultimately happened. I'm not certain that inference is fair. And again, if we're going to reach the conclusion that the steps taken were not adequate simply because the ultimate act occurred, then I just think we've put ourselves into a corner where literally every case will necessarily survive summary judgment and make it to a jury. And I don't think that that's the intent of the law, which has a clear restrictive purpose in trying to limit the scopes of these types of cases. I think the trial court had sufficient evidence before it of the specific complaints that were made by the student and of the specific conduct taken by the school district, and it ultimately rendered its decision that it didn't reflect either... Well, actually the court didn't speak to this, the discrimination by the school district, but the district court specifically concluded that while that might be indicative of negligence, it doesn't rise to the level of deliberate indifference. And I submit, I mean, we can go round and round on this one, and I understand the court's concern. And I have no dispositive argument to make to you, especially given that there is no careful chronological recitation in the record. I guess we have to look at whether Winston carries the day for you, because the plaintiff did get to counsel Winston about the teasing. Winston told him, don't worry about it, the teasing would go away. But then Winston called each of the students that the plaintiff had complained about into her office, told them she didn't want to hear another report that the students were saying anything to the plaintiff. She called the students' parents and informed them of the complaints and got no further complaints. So I guess as a matter of law, that's enough. You win. If it's not, it goes to trial. I guess that's what the court has to wrestle with. I submit that it was enough. I submit that the district court's analysis in this case was exhaustive and was very careful. And respectfully, I submit that the district court order granting summary judgment should be affirmed. Thank you. Thank you. Well, if I understand fully your position, your position is that in order to show deliberate indifference, the school district would have to have known there was a substantial risk or material risk that violence would ensue. And therefore, the measures they took had to have that in mind, and they deliberately chose not to. And so the question we have to judge is whether, based on this record, somebody would see this as the kind of situation that's likely to erupt in violence. If you don't make that prediction that violence is the next step, then you can't have deliberate indifference. That's the issue, Your Honor. And ultimately, I think it turns back on the school district's response in calling every one of the students, calling every one of their parents, telling them to knock it off, and the absence of evidence of any escalation, to use Your Honor's word, from that time forward. Again, respectfully, I submit the district court's decision is carefully analyzed, is correct on the law, and should be affirmed. Thank you. We'll give you a minute, Ms. Klobuchar, if you wish. Thank you, Your Honor. I only wish to address two things. First of all is, of course, the issue with regard to the Eleventh Amendment. I do wish the Court to note that in Appellant's reply brief, I identified the statutes that counsel referred to that the Ballenger Court reviewed. Over 20 of them were repealed by the California legislature between then and now. We have repeal of You've got numbers going for you, but what about the substance of the ones that were repealed? Did they undercut the idea that the State ends up paying the judgment? No, Your Honor. Well, excuse me. Before I speak to that, I should say that they address the issue of funding of a school. Who's they? Excuse me. These code sections, the Education Code sections, 42,000 series. Did they eliminate the idea that the State pays for the judgment? They don't address whether the State pays for the judgment. They address funding of a school for education purposes. They don't address the judgment issue. The issue is not whether they pay for the judgment, but whether the judgment would satisfy those State funds. Right. Correct. And do they do they does repeal of these sections change the answer to that question? These are the sections that the Ballenger Court relied upon in making its determination. But that's not answering the question. The code sections that are that that were not addressed. Are you telling us that we can take judicial notice of new statutes that change the situation described by Judge Kaczynski? There were statutes in existence at that time, Your Honor. Are you telling us there are new statutes or old statutes have disappeared that change the understanding we had as to where ultimately the money comes from? Yes, Your Honor. There were in existence. What are the statutes that are new and different? The statutes that changed the that would have changed the Ballenger decision, which were not presented in the briefings that I read on Ballenger, were Education Code 35200, where the school district pays. Those statutes were in existence at the time. Yes. But for whatever reason, were not relied on in Ballenger. Were not submitted. That's not the kind of after, you know, subsequent development that would allow us to reconsider Ballenger on our own. The Mitchell factors, as I understand it, in regard to these Education Codes that I'm speaking of, these Education Codes answer the Mitchell factors. These Education Codes were not in the briefings on Ballenger. Okay. We're looking at them. What do they say? And they say that the school district pays for its own debts. It contracts with private counsel. It contracts for legal services. It purchases its own liabilities or insurance. And Where does the money come from that it uses to do that? And it raises its own funds to do so. And it provides that the California Tort Claims Act governs the judgments that are to be paid by the local school districts. That the local school districts provide for their own judgment payments. That it does not come from the State Comptroller. The State Comptroller has nothing to do with judgments issued against just local school districts. So where does the money come from? The local school districts raise their own funds, provide for their own insurance to cover judgments made against them. Are they cookie sales? Your Honor, that's in the Code. I'm sorry. Cookie sales, maybe. They do. The school districts are required, Education 35201, to pay their own judgments. That Code section was superseded in 1980 by the California Tort Claims Act. Government Code sections 970 of SEC. Which in changing this from education to tort claims, the legislature impliedly treated the school district as a local public entity. All right. Let me sort of shift gears on you a little bit. You heard me read this before. Winston called every one of the students. Tried to stop it. Called their parents. Got no further complaints. Why isn't that enough? What should Winston have done? There were, Winston should have offered a mediation. Winston should have offered training and discussion amongst all of the children. The teachers are obligated to do this. They did not do so. And it's obligated under Federal and State law. And there were prior acts of harm, of attacks on other students, violence in that school. There were four documented prior acts between January and February of that year against other students. By the same students that you're dealing with here? No, Your Honor. But by a lot of other students. There are over 20 in the record. Against disabled students? Against, no, against all students. Against other students in the campus. All right. If we're going to hold that against the school district or, you know, that schools, of course, where violence is much more common than others, school districts and particular schools, and so it has a different level of viability if you have a school where violence is more common. If I might, with regard to the liability, if the school knew or should have known of the violence, then there is liability. A district court case, Nicole M. v. Martinez Unified, referred to that in a Title IX case. Isn't that a negligence standard you're applying? Isn't the standard deliberate indifference? Don't they have to, in fact, know, not should have known, know that violence is a serious possibility and they ignore it? Once they have knowledge that a harm may occur and they take no steps to investigate further into the results of what might happen. Sounds like negligence to me. I mean, how would you articulate negligence if that's deliberate indifference? What does negligence look like? Negligence is the breach of a duty, yes. Deliberate indifference could be also a breach of a duty. But deliberate indifference... Well, what if you do something? Don't you have a different threshold to establish indifference? Indifference generally involves doing nothing, doesn't it? Deliberate indifference, repeatedly ignoring the issues or consistently failing to investigate. They did one thing, two things. They called the mother and they called the parents of the students, period. And they talked to the students themselves. One time. One time. And we have nothing in this record. It might be a different record, but we have nothing in this record that continuation of the behavior was reported to the school until the triggering event for these, for this case. There is, and it should be in the record, that Xavier was harassed in class two days before this happened. The kids were throwing papers at him because he couldn't... The same kids that attacked him? I believe it was, Your Honor. I have to look at the record. Because he has specific learning disabilities and he was unable to keep up with the timeliness of the assignment. And he went to the nurse at that time and complained again. I do know that... Does the record show that that occurred after the parents were called and all of that? Because that becomes critical, it seems to me, on the question of deliberate indifference, that having taken steps, you ignored further acts. That event occurred two days before the attack. And I would submit to you that if the parents were called either before either of those two acts, it didn't help. And how are the parents supposed to control the children anyhow? The parents aren't on campus. They're not in 21st century America. They're not on campus. They, you know... And so I also want to remind the... Do you have a cause of action against the families for having been on notice that their children were harassing and beating up somebody and not doing anything? No, Your Honor. We did not. I don't think it's been tried yet. It has not. The state courts are waiting for that claim. Thank you. Case is argued. We'll stand some minutes.
judges: McKay (10th Circuit), Kozinski, Trott